UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
FILED
SEP 15 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

VICTOR ANTONIO GONZALEZ MATAILO,

Petitioner,

v.

26-CV-1406 (JLS)

WARDEN, *Buffalo Service Processing Center*; PHILIP RHONEY, *in his official capacity as Acting Buffalo Field Office Director, U.S. Immigration & Customs Enforcement*; JAMES BAUSCH, *in his official capacity as Acting Deputy Buffalo Field Office Director, U.S. Immigration & Customs Enforcement*; DAVID VENTURELLA, *in his official capacity as Acting Director, U.S. Immigration & Customs Enforcement*; and MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*,

Respondents.[1]

# ORDER

Petitioner Victor Antonio Gonzales Matailo is a native and citizen of Ecuador who has filed a habeas corpus proceeding before the Court pursuant to 28 U.S.C. § 2241. Dkt. 1 at 3. Respondents moved to dismiss the petition (Dkt. 4), Petitioner filed a response in opposition to the motion to dismiss (Dkt. 5), and Respondents filed a reply (Dkt. 7). Respondents also filed a motion to seal documents. *See* Dkt. 8.

[1] The caption has been updated pursuant to Federal Rule of Civil Procedure 25(d).

For the reasons set forth by this Court in *Aguilar-Villalobos v. Blanche*, No. 26-CV-604 (JLS), 2026 WL 2137945 (W.D.N.Y. July 23, 2026) and Respondents' briefing (Dkt. 4-1; Dkt. 7), Respondents' [4] motion to dismiss is GRANTED and the [1] petition is DENIED. *See* Exhibit A. And for the reasons set forth in Respondents' motion to seal, that motion is GRANTED. *See* Dkt. 8. The Clerk of Court is directed to close this case.

Dated: September 15, 2026
Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

UNITED STATES DISTRICT COURT
FILED
JUL 23 2026
ANDREW W. MOELLER, CLERK
WESTERN DISTRICT OF NY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

WARDIS AGUILAR-VILLALOBOS,

Petitioner,

v.

26-CV-604 (JLS)

TODD BLANCHE, *in his official capacity as Acting Attorney General*; MARKWAYNE MULLIN, *in his official capacity as Secretary of Homeland Security*; MICHAEL BALL, *in his official capacity as Acting Deputy Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement*; and PHILIP RHONEY, *in his official capacity as Acting Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement*,

Respondents.[1]

---

**DECISION AND ORDER**

Petitioner Wardis Aguilar-Villalobos is a native and citizen of El Salvador who has filed a *habeas corpus* proceeding before this Court pursuant to 28 U.S.C. § 2241. Dkt. 1 at 10, 44. Respondents moved to dismiss the petition. Dkt. 11. This is not the first time that Petitioner has filed a *habeas corpus* proceeding before this Court. *See Aguilar-Villalobos v. Kurzdorfer*, 812 F. Supp. 3d 279 (W.D.N.Y. 2025). In Petitioner's previous case, this Court denied Petitioner's *habeas corpus* petition, holding that

---

[1] The caption has been updated pursuant to Federal Rule of Civil Procedure 25(d).

Petitioner's immigration detention was not unreasonably prolonged in violation of Fifth Amendment due process. *Id.* at 288. This Court reasoned that Petitioner was detained as a "'certain other alien' under 8 U.S.C. § 1225(b), who, under the statutory and regulatory framework, is treated as an 'arriving alien.'" *Id.* at 285.

Even if this were not the case, this Court has examined the Second Circuit's recent decision in *da Cunha v. Freden*, 175 F. 4th 61 (2d Cir. 2026). To the extent the holding therein conflicts with this Court's decisions in *Rivera Castillo v. Rhoney*, No. 25-CV-1065 (JLS), 2026 WL 775995 (W.D.N.Y. Mar. 19, 2026), and *Ferreira Candido v. Bondi*, No. 25-CV-867 (JLS), 2025 WL 3123696 (W.D.N.Y. Nov. 7, 2025), this Court would be bound to follow the Second Circuit's *da Cunha* dictates.[2]

## <u>DISCUSSION</u>

### I. SECTION 1225 IS THE STATUTORY BASIS FOR PETITIONER'S DETENTION.

As relevant here, in *da Cunha*, the Second Circuit ruled that:

1. "A noncitizen like [da Cunha] is unlawfully present, and thus an 'applicant for admission,' but indisputably *never sought* or applied for lawful entry after inspection and authorization, and is not doing so now. To the contrary, he evaded immigration inspectors, snuck into the country, and today applies only for non-admission forms of relief, including asylum and cancellation of removal." *da Cunha*, 175 F.4th at 75–76.

[2] The Court notes that the Government filed a petition for a writ of certiorari in a case analogous to *da Cuhna*. *See* Petition for Writ of Certiorari, *Raycraft v. Lopez-Campos*, No. 25-1415 (U.S. Jun. 22, 2026), Dkt. No. 1.

2. "Here, although [da Cunha] is an applicant for admission under the statutory definition because he is present in the country and has never been admitted, it simply cannot be said that he is 'seeking admission,' as he is not requesting lawful entry into the United States. By total contrast, [da Cunha] entered the interior unlawfully twenty years ago and is now seeking only relief from removal. Therefore, because Section 1225(b)(2)(A) applies only to a noncitizen who is both an 'applicant for admission' and 'seeking admission,' it does not apply to [da Cunha]." *Id.* at 74.
3. "Section 1225(b)(2)(A) does not apply to such noncitizens, who are present in the United States after entering the country without inspection and admission, *and who were not apprehended while entering the country or shortly thereafter*." *Id.* at 69.
4. "Together, Section 1225(b)(2) therefore applies only to (1) noncitizens who are present and have not been admitted, and (2) are requesting (3) lawful entry into the United States after inspection and authorization." *Id.* at 74.
5. "Instead, Section 1225(b)(2)(A) applies to those noncitizens who present themselves at a port of entry for admission, *or who cross the physical border into the United States but are apprehended at the 'threshold of initial entry.'*" *Id.* at 75 (quoting *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020) (holding that a noncitizen "apprehended just 25 yards from the border" had not effected an "entry"), and citing *Leng May Ma v. Barber*, 357

U.S. 185, 189 (1958) (treating noncitizens paroled into the country "as [if] stopped at the boundary line")) (citation modified).

. . .

In *da Cunha*, the Second Circuit drew a distinction between aliens who "snuck into" the country and "evaded" detection for years (ruling that a bond hearing is required) and aliens who were encountered at or near the border (where no bond hearing is required).

Here, if *da Cunha* applied, Petitioner would be in the latter category. *See* Dkt. 1, at 2 (explaining how in 2012, Petitioner was detained by Border Patrol and released on bond); Dkt. 23, at 1 ("Petitioner Aguilar-Villalobos entered the United States in 2012 and was released on bond"); *see also Aguilar-Villalobos*, 812 F. Supp. at 285 ("Petitioner entered the United States at the United States-Mexico Border . . .[, and] was detained within 100 miles of the border and within 14 days of his entry into the United States—and then established a credible fear of persecution and was referred for further consideration of his asylum application.").[3]

[3] Petitioner argues that because he was not paroled, his detention could not be classified as a Section 1225(b) case. This argument may have arisen because in most of its recent cases, the Government has only been opposed to a bond hearing in cases where the petitioner was encountered at or near the border *and* released on parole. In the instant case, however, the Government elaborates that it is opposed to a bond hearing for Petitioner because its position is based not on "how an alien is released from detention" but on how an alien "enters the United States." *See* Dkt. 25. This position comports with Section 1225(b)(1)(B)(ii), which indicates that "[i]f the officer determines at the time of the interview that an alien has a credible fear of persecution

As such, under *da Cunha*, "Section 1225(b)(2)(A) applies to those noncitizens who present themselves at a port of entry for admission, *or who cross the physical border into the United States but are apprehended at the 'threshold of initial entry.'*" *da Cunha*, 175 F.4th at 75 (citation modified).

Even if Section 1225(b)(1)(B)(ii) did not apply, Petitioner certainly would have been "seeking admission" into the United States under Section 1225(b)(2)(A) when he entered and was first encountered by government agents. He was at or near the border intending to enter and remain here. He has voluntarily remained since (until the commencement of his current detention), thereby continuing to "seek" admission to the United States. How could it be otherwise? If he were not so seeking admission, he would have given up and departed already and, certainly, would have so departed after his release. In sum, Petitioner is not entitled to a bond hearing under either Section 1225(b)(1)(B)(ii) or Section 1225(b)(2)(A).

## II. PETITIONER'S DETENTION COMPORTS WITH THE FIFTH AMENDMENT

Petitioner also challenges the constitutionality of his detention under the Fifth Amendment's Due Process Clause, arguing that it has become prolonged.

It is indisputable that Petitioner has been detained for a long time. In 2022, Petitioner was convicted of "attempted gun possession" in New York state court and sentenced to "30 months" of imprisonment. Dkt. 1, at 2. He was ordered deported by

. . . , the alien *shall be detained* for further consideration of the application of asylum." § 1225(b)(1)(B)(ii) (emphasis added). This position also comports with this Court's previous finding in *Aguilar-Villalobos*. 812 F. Supp. at 285.

an immigration judge on February 26, 2023. *Id.* at 25. Petitioner appealed this decision on March 13, 2023, to the Board of Immigration Appeals. *Id.* This appeal was denied on August 1, 2024. *Id.* On August 10, 2024, Petitioner appealed his case to the Second Circuit Court of Appeals. *Id.* The Second Circuit granted him a stay of removal pending review. *Id.*; *see also* Dkt. 23, at 1 (Petitioner has "a stay motion granted before the Second Circuit on his withholding of removal case."). Due to this procedural history, Petitioner has been detained for several years. Dkt. 23, at 1.

Nonetheless, Petitioner's argument fails.

The Fifth Amendment provides that no person shall be (1) "deprived of," (2) "liberty," (3) "without due process of law." U.S. CONST. amend V.

It is "well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings." *Demore v. Kim*, 538 U.S. 510, 523 (2003) (quoting *Reno v. Flores,* 507 U.S. 292, 306 (1993) (citation modified). But Petitioner is not complaining about the conduct of his deportation *proceedings*. Moreover, the Supreme Court has recognized that, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Id.* Indeed, "deportation proceedings 'would be in vain if those accused could not be held in custody pending the inquiry into their true character.'" *Id.* (quoting *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). *See also Zadvydas v. Davis*, 533 U.S. 678, 711 (2001) (Kennedy, J., dissenting) ("Congress' power to detain aliens in connection with removal or exclusion . . . is part of the Legislature's considerable authority over immigration matters.").

Equally clear are the "constraints on governmental decisions [that] deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth . . . Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To determine the safeguards necessary to ensure that a petitioner receives "the opportunity to be heard at a meaningful time and in a meaningful manner," the Court considers: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of [that] interest through the procedures used, and the probable value, if any, of additional procedural safeguards;" and (3) the "[g]overnment's interest, including the function involved and the . . . burdens that [any other] procedural requirement would impose." *Id.* at 333, 335 (citation modified). That analysis animates the Court's thinking throughout, and is done explicitly below.

As noted above, Petitioner's detention is mandatory under 8 U.S.C. § 1225(b)(2)(A). His current due process claim now fails for several reasons. First, he lacks a protected liberty interest in being released into the United States—all while he has the power to end his detention by withdrawing his defense to removal proceedings and consenting to removal. Second, whatever process that is due is provided by statute—which requires neither release nor a bond hearing. Lastly, the *Mathews* factors would, in any event, provide no relief here, when Congress has prescribed his mandatory detention. For each of these independent reasons, the due process argument fails, and the petition must be dismissed.

## A. Petitioner Lacks a Constitutionally Protected Interest

While "the amount and quality of process that [the Supreme Court's] precedents have recognized as 'due' under the Clause has changed considerably since the founding, it remains the case that *no* process is due if one is not deprived of 'life, liberty, or property.'" *Kerry v. Din*, 576 U.S. 86, 90 (2015) (citation modified). Accordingly, to maintain a due process claim, a party first must have "a protected liberty interest." *Baez v. Pinker*, 673 F. App'x 50, 52 (2d Cir. 2016) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (substantive due process); *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 571–72 (1972) (procedural due process)).[4] Indeed, it is "axiomatic that a cognizable liberty . . . interest must exist in the first instance for a procedural due process claim to lie." *Mudric v. Att'y Gen. of U.S.*, 469 F.3d 94, 98 (3d Cir. 2006) (citing *Roth*, 408 U.S. at 569).

This Court's due process analysis, therefore, "must begin with a careful description of the asserted right." *Reno*, 507 U.S. at 302. And to articulate Petitioner's proffered liberty interest is to refute its existence.

In particular, Petitioner, an unadmitted alien, challenges his confinement in immigration detention. *See* Dkt. 1, at 28–29. In *Zadvydas*, the Supreme Court considered due process claims pertaining to aliens "who were admitted to the United States but subsequently ordered removed." 533 U.S. at 682. In that scenario, like the one presented here, the alien can be said to "claim[] a constitutional right of supervised release *into the United States*." *Id.* at 702 (Scalia and Thomas, JJ.,

[4] Petitioner "could not conceivably claim" deprivation of "life or property" on these facts. *See Din*, 576 U.S. at 92.

dissenting) (citation modified). And that claim "can be repackaged as freedom from 'physical restraint' or freedom from 'indefinite detention,' but it is[,] at bottom[,] a claimed right of release into this country by an individual who *concededly* has no legal right to be here." *Id.* (citation modified) (emphasis in original).

More precisely, Petitioner's proffered "private interest" is "not liberty in the abstract, but liberty *in the United States* by someone [not] entitled to remain in this country but eligible to live at liberty in his native land." *Parra v. Perryman*, 172 F.3d 954, 958 (7th Cir. 1999) (emphasis in original). In other words, Petitioner claims a constitutionally protected right to (1) release from custody, (2) into the United States, (3) all while he holds the keys to his freedom from physical restraint by leaving the country.[5]

The Constitution protects no such liberty interest. As discussed below, the Supreme Court's precedents, including *Zadvydas*, *Demore*, and *Jennings*, establish that: (1) a removable alien does not have a liberty interest in being released into the United States while removal proceedings are pending; and (2) detention under Section 1225(b) has a definite termination point and, therefore, does not implicate the due process concerns associated with indefinite detention. Accordingly, Petitioner has not been deprived of a protected liberty interest. His due process claim, therefore, must fail.

---

[5] That is fundamentally different from a detention over which Petitioner has no control.

1. <u>Petitioner Does Not Have Protected Liberty Interest in Release into the United States</u>

There is no basis in the Supreme Court's precedents—or elsewhere in this nation's history and traditions—to expand the meaning of "liberty" to encompass the interest Petitioner suggests.

Indeed, at the outset, "liberty," as "originally understood . . . likely referred only to freedom from physical restraint." *Gutierrez v. Saenz*, 606 U.S. 305, 325 (2025) (Thomas, J. dissenting). In the eighteenth century, William Blackstone defined "the right of personal liberty" as "the power of loco-motion, of changing situation, or removing one's person to whatsoever place one's own inclination may direct; without imprisonment or restraint, unless by due course of law." WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 130 (1765). Following Blackstone, "[s]tate decisions interpreting [state due process] provisions between the founding and the ratification of the Fourteenth Amendment almost uniformly construed the word 'liberty' to refer only to freedom from physical restraint." *Obergefell v. Hodges*, 576 U.S. 644, 724–25 (2015) (Thomas, J., dissenting) (citing C. Warren, The New "Liberty" Under the Fourteenth Amendment, 39 HARV. L. REV. 431, 441–45 (1926)).

But this case is not simply a case about criminal pretrial detention or other straightforward infringements on freedom from physical restraint. Instead, Petitioner himself, an applicant for admission, controls whether or not he is detained. He can free himself by agreeing to depart. The claimed interest is unique and, as such, an analogous measuring tool that is based on history and tradition is needed, and may be found in the context of the Supreme Court's adjacent "fundamental rights" caselaw.

For example, *Glucksberg* supports this thought process. *See, e.g., Dep't of State v. Muñoz*, 602 U.S. 899 (2024).[6] *Glucksberg* requires—in addition to a "careful description of the asserted fundamental liberty interest"—that the purported right be "objectively, deeply rooted in this Nation's history and tradition." 521 U.S. at 720–21 (citation modified). That test helps assess the claimed liberty interest here.

Petitioner identifies no historical law—or any other aspect of this country's history or traditions—that supports an unadmitted alien's claimed constitutional liberty interest in release into the United States (or a bond hearing) while he holds the keys to his freedom while trying to avoid removal.

Indeed, early immigration laws concerning detention lend no support to Petitioner's position. From the outset, the first federal immigration laws have generally authorized detention of aliens who are subject to removal. *See* HILLEL R. SMITH, CONG. RSCH. SERV. R45915, IMMIGRATION DETENTION: A LEGAL OVERVIEW 5 (2019). The first law on alien detention was the Alien Enemies Act in 1798, which subjected certain aliens from "hostile" nations during times of war to being detained and removed. *See id.* (citing Alien Enemies Act, 5 Cong. ch. 66, §§ 1, 2, 1 Stat. 577 (1798)). *See also Land of the Free? Immigration Detention in the United States*, 64

[6] *Muñoz* considered a right "in a category of one: a substantive due process right that gets only procedural due process protection." 602 U.S. at 911. In particular, the Court applied *Glucksberg* in a situation where a citizen claimed that her "right to live with her noncitizen spouse in the United States is implicit in the 'liberty' protected by the Fifth Amendment. . . [and] the denial of her husband's visa deprived her of this interest, thereby triggering her right to due process." *Id.* at 903. The Court rejected her claim, noting that "procedural due process is an odd vehicle for [her] argument." *Id.* at 919.

Fed. Law. 46, 48 (2017) (noting that the Alien Enemies Act "became the first (and oldest) statute authorizing alien detention").

Starting in 1875, "Congress enacted a series of laws restricting the entry of certain classes of aliens (*e.g.*, those with criminal convictions), and requiring the detention of aliens who were excludable under those laws until they could be removed." SMITH, *supra* at 5 (citing Page Act of 1875, 43 Cong. ch. 141, § 5, 18 Stat. 477 (1875); Immigration Act of 1882, 47 Cong. ch. 376, § 2, 22 Stat. 214 (1882); Immigration Act of 1891, 51 Cong. ch. 551, § 8, 26 Stat. 1084, 1085 (1891); An Act to Facilitate the Enforcement of the Immigration and Contract-Labor Laws of the United States, 52 Cong. ch. 206, § 5, 27 Stat. 569, 570 (1893)).

In construing the Government's detention authority, the Supreme Court in 1896 declared; "[w]e think it clear that detention or temporary confinement, as part of the means necessary to give effect to the provisions for the exclusion or expulsion of aliens, would be valid." *Wong Wing*, 163 U.S. at 235. And as noted above, the Court explained: "[p]roceedings to exclude or expel would be vain if those accused could not be held in custody pending the inquiry into their true character, and while arrangements were being made for their deportation." *Id.*

Over the next few decades (leading up to enactment of the INA), Congress "continued to enact laws generally mandating the detention and exclusion of proscribed categories of aliens seeking entry into the United States, as well as aliens physically present in the United States who became subject to removal." SMITH, *supra* at 6 (citing Immigration Act of 1903, 57 Cong. Ch. 1012, § 21, 32 Stat. 1213, 1218

(1903); Immigration Act of 1907, 59 Cong. Ch. 1134, §§ 20, 21, 24, 34 Stat. 898, 904-06 (1907); Immigration Act of 1917, 64 Cong. Ch. 29, §§ 16, 19, 39 Stat. 874, 886, 889 (1917)).

No aspect of this historical landscape supports Petitioner's purported liberty interest. Petitioner has not been deprived of any protected liberty interest. To the extent he seeks "freedom from physical restraint," he may "withdraw his defense of the removal proceeding and return to his native land, thus ending his detention immediately." *See Parra*, 172 F.3d at 958. In other words, he holds "the keys in his pocket." *Id.* But it stretches the concept of liberty "too far" to suggest that Petitioner is deprived of liberty when he is not released *into the United States*—all while he holds the keys to his freedom, yet fights his removal.

2. Petitioner Does Not Have a Protected Liberty Interest in Freedom from "Prolonged" Detention

Nor can Petitioner establish a protected liberty interest based on the duration of his detention in DHS custody. There is no suggestion that his detention is divorced from ongoing, good-faith removal proceedings. And as discussed below, Petitioner's detention has a definite termination point: the conclusion of his removal proceedings. In the meantime, he may obtain release by consenting to removal to his native country rather than continuing to contest removal. These circumstances differ materially from the sort of potentially indefinite detention that the Supreme Court instructs may, at some point, raise due process concerns.

For example, in *Zadvydas*, the Supreme Court concluded that "indefinite detention of aliens" who "were admitted to the United States but subsequently ordered removed" would "would raise serious constitutional concerns." 533 U.S. at 682.[7]

Two years later, in *Demore*, the Court distinguished detention of criminal aliens under Section 1226(c) from the indefinite detention discussed in *Zadvydas*. In particular, the Court concluded that Section 1226(c) detention is permissible because it is neither "indefinite" nor "potentially permanent." *See* 538 U.S. at 528.[8] *Zadvydas* itself recognized the same distinction. There, the Court distinguished Section 1231 from Section 1226(c) based on the indefiniteness of the detention: "importantly," the Court said, "post-removal-period detention, unlike detention pending a determination of removability or during the subsequent 90-day removal period, has no obvious termination point." *Zadvydas*, 533 U.S. at 697. *See also Demore*, 538 U.S. at 529 ("*Zadvydas* distinguished the statutory provision it was there considering from [Section] 1226 on these very grounds.").

*Zadvydas* also recognized that aliens, like Petitioner here, "*who have not yet gained initial admission to this country*[,] would present a very different question" than "aliens who were admitted to the United States but subsequently ordered

---

[7] *Zadvydas* addressed detention under Section 1231, which governs detention of aliens subject to final orders of removal.

[8] The Court later emphasized in *Jennings* that *Demore* "made clear" that the "definite termination point—and not some arbitrary time limit devised by courts—marks the end of the Government's detention authority under § 1226(c)." 583 U.S. at 304 (citation modified).

removed." 533 U.S. at 682 (citation modified). The *Jennings* Court then concluded that Sections "1225(b)(1) and (b)(2) . . . mandate detention of applicants for admission until certain proceedings have concluded." 583 U.S. at 297. And once "those proceedings end, detention under [Section] 1225(b) must end as well." *Id.* Until "that point, however, nothing in the statutory text imposes any limit on the length of detention." *Id.*[9]

*Zadvydas* also instructs that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701. In other words, only "once removal is no longer reasonably foreseeable" is "continued detention . . . no longer authorized by statute." *Id.* at 699. Due process considerations arise once removal is no longer foreseeable because, "where detention's goal is no longer practically attainable, detention no longer bears a reasonable relation to the purpose for which the individual was committed." *Id.* at 690 (citation modified). That "purpose," the Court said, was "ensuring the appearance of aliens at future immigration proceedings." *Id.* (citation modified).

[9] It is true that, in *Demore*, the Court described detention pending deportation as "brief," "limited," and "short[ ]." *Demore*, 538 U.S. at 513, 523, 526. But nothing in *Demore* mandates any specific form of brevity; nor does *Demore* define that term. Instead, the *Demore* Court recognized that detention pending a determination of removability has a "definite termination point." *Id.* at 529. In short, it is the indefiniteness of the detention—not its mere length—that implicates the Due Process Clause. The "*why*, in other words, is more important than *how long*." *Banyee v. Garland*, 115 F.4th 928, 932 (8th Cir. 2024) (emphasis in original).

But the key principle of *Zadvydas*, requiring additional justification for detention that no longer serves its purpose, does not apply in the case of applicants for admission whose removal proceedings are ongoing. Under the circumstances of *Zadvydas*—where "removal proceedings had ended, a final order of removal had issued, the statutory removal period had expired, and there still was no likelihood of effectuating the removal—the detention no longer appeared to serve the purpose of facilitating ongoing removal proceedings." *Black v. Almodovar*, 156 F.4th 171, 183 (2d Cir. 2025) (Menashi, J., dissenting from the denial of rehearing en banc) (citing *Demore*, 538 U.S. at 527).[10]

Those circumstances bear no resemblance to detention of applicants for admission during removal proceedings. Detention under Section 1225(b)(2)(A) is authorized—and required—if the "examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." And as the *Jennings* Court noted, detention under Section 1225(b) must end when certain proceedings have concluded.

At bottom, the duration of Petitioner's detention has resulted from his continued attempts to avoid removal and remain in this country. He is, in essence, his own gatekeeper.

---

[10] On June 15, 2026, the Supreme granted certiorari on the issue of whether there is a point at which an alien's detention under 8 U.S.C. § 1226(c), pending a decision on removal, becomes "unreasonably prolonged," such that due process requires a bond hearing. *See Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), *cert. granted*, *Genalo v. Black*, 2026 WL 1718025 (U.S. Jun. 15, 2026) (No. 25-886).

Petitioner, of course, may avail himself of all "process" available to him in his removal proceedings—including requesting extensions of time, adding claims or bases for relief from removal, and appealing all adverse decisions. But he cannot expect resulting delay in his removal proceedings to give birth to a due process claim. If a petitioner could delay enough and thereby earn release, he could defeat the process. *See Demore*, 538 U.S. at 531 n.14 (concluding "there is no constitutional prohibition against requiring parties" to "mak[e] . . . difficult judgments," such as whether to risk a lengthier detention by exercising their right to appeal); *id.* at 531 n.15 (considering the delay resulting from the alien's request for a continuance of his removal hearing so he could obtain relevant documents).

Indeed, the Second Circuit has held that, "[a]lthough this litigation strategy is perfectly permissible," an alien "may not rely on the extra time resulting therefrom to claim that his prolonged detention violates substantive due process." *Doherty v. Thornburgh*, 943 F.2d 204, 211 (2d Cir. 1991).

The fact is that an alien detained under Section 1225(b) "'has the keys in his pocket' and can 'end his detention immediately' by 'withdrawing his defense and returning to his native land.'" *Banyee*, 115 F.4th at 933 (citation modified) (quoting *Parra*, 172 F.3d at 958). And as the Second Circuit noted in another context, "from the outset of his detention, [the petitioner] has possessed, in effect, the key that unlocks his prison cell." *Doherty*, 943 F.2d at 212.

Here, too, if Petitioner "had agreed to deportation in the first place, he would not have been detained" for the past 8 months. *See id.* He controls whether he is

detained or not. Indeed, it is "a perverse interpretation of the Due Process Clause" under which Congress, by affording an unadmitted alien "*more* process to contest his removal and to seek immigration relief, thereby invalidates its own authority to detain the alien until the process concludes." *See Black*, 156 F.4th at 186 (Menashi, J., dissenting from the denial of rehearing en banc) (emphasis in original).

In sum, the length of Petitioner's detention does not violate due process. There is no indication that Petitioner's pending removal proceedings are a sham, or that Respondents are otherwise unlikely to effectuate his removal—if ordered and upheld—in the reasonably foreseeable future. What "is important is that, notwithstanding [any] delay, deportation remains a possibility." *Banyee*, 115 F.4th at 933) (citation modified). And because detention under Section 1225(b) "has a definite termination point" at "the conclusion of removal proceedings," removal remains possible throughout Section 1225(b) detention. *Jennings*, 583 U.S. at 304 (citation modified).

This conclusion adheres to the Supreme Court's instruction that "an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future." *Zadvydas*, 533 U.S. at 701.

The Court's holding in *Demore* aligns with its prior recognition that "the responsibility for regulating the relationship between the United States and [its] alien visitors [is] committed to the political branches of the Federal Government." *Diaz*, 426 U.S. at 81. Indeed, "[o]ver no conceivable subject is the legislative power of Congress more complete." *Flores*, 507 U.S. at 305 (citation modified). Because decisions

regarding immigration "may implicate [the United States'] relations with foreign powers, and [because] a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently . . . more appropriate [for] either the Legislature or the Executive than [for] the Judiciary." *Diaz*, 426 U.S. at 81. *See also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) (citing *Diaz*, 426 U.S. at 81) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government.").

Indeed, imagine a scenario where the number of aliens surges, increasing the volume of removal proceedings and, thereby, slowing the pace at which those proceedings move. If duration alone warrants bond hearings, that scenario arrogates this very sovereignty issue to the judiciary—and to the aliens themselves by virtue of their chosen litigation strategy. The Constitution does not require that outcome.

As a result of these broad concerns, the Supreme Court has "underscore[d] the limited scope of judicial inquiry" into issues related to immigration legislation. *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The power over matters related to "aliens is of a political character and therefore subject only to narrow judicial review." *Id.* (citation omitted). In particular:

> [A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.

*Diaz*, 426 U.S. at 81 n.17 (citation modified).

Against this careful backdrop, courts must pay particular attention to the constitutional interests, governance concerns, and individual rights involved in these weighty questions. Indeed, courts must employ "a narrow standard of review of decisions made by the Congress or the President" regarding immigration and must exercise "the greatest caution" in evaluating constitutional claims that implicate those decisions. *See id.* at 81–82.

Under these circumstances, Petitioner does not have a constitutionally protected liberty interest.

### B. Any Process Due to Petitioner is Provided by Statute

Even assuming the existence of a relevant, protected liberty interest, Petitioner has received all the process that he is due. As discussed above, Petitioner is an "applicant for admission" under Section 1225(a)(1) and is detained pursuant to Section 1225(b)(2)(A). Accordingly, for the reasons below, any process due to Petitioner is limited to the procedure authorized by Congress, which requires neither release nor a bond hearing.

Once an "alien *lawfully* enters and resides in this country[,] he becomes invested with the rights guaranteed by the Constitution to all people within our borders." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 n.5 (1953) (citation modified).[11] But the Supreme Court "has long held that an alien *seeking initial*

[11] Indeed, "[m]ere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to

*admission* to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative." *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) (citation modified). Indeed, the "Bill of Rights is a futile authority for the alien seeking admission for the first time to these shores." *Kwong Hai Chew*, 344 U.S. at 598 n.5.[12]

More than a century ago, the Supreme Court "wrote that[,] as to 'foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law,' 'the decisions of executive or administrative officers, acting within powers expressly conferred by

---

those of full citizenship upon naturalization." *Id.* The Court is aware that the Supreme Court has recognized due process rights in aliens' removal proceedings, *see, e.g.*, *Demore*, 538 U.S. at 523 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings") (quoting *Reno*, 507 U.S. at 305), and that certain rights apply to all "persons." But a very narrow claimed right is at issue in this case.

[12] The Court rejects any argument that Petitioner is not "seeking admission" because he was not apprehended the instant he attempted to enter the country. In *Department of Homeland Security v. Thuraissigiam*, the Supreme Court rejected an argument that an alien who "succeeded in making it 25 yards into U.S. territory before he was caught" should be "treated more favorably" than if he had been stopped at the border. 591 U.S. 103, 139 (2020). Like "an alien detained after arriving at a port of entry," Petitioner must be treated as if he "is 'on the threshold'" of initial entry. *Id.* at 140 (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)). In other words, although Petitioner had been "physically present in the United States" for a period of time prior to apprehension by DHS, he "is 'legally considered to be detained at the border and hence as never having effected entry into this country.'" *Sierra Immigr. & Naturalization Serv.*, 258 F.3d 1213, 1218 (10th Cir. 2001) (quoting *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437, 1440 (5th Cir.), *amended by* 997 F.2d 1122 (5th Cir. 1993)). To conclude otherwise "would undermine the 'sovereign prerogative" of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Thuraissigiam*, 591 U.S. at 140 (quoting *Landon*, 459 U.S. at 32). The duration of time evading removal does not change the result.

Congress, are due process of law.'" *Thuraissigiam*, 591 U.S. at 138 (quoting *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). Since then, the Court "has often reiterated this important rule." *Id.*

For example, in 1953, the Court emphasized that "an alien on the threshold of initial entry" stands on a "different footing" than "aliens who have once passed through our gates"—and explained that, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Mezei*, 345 U.S. at 212 (citation modified). *See also U.S. ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950) ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). Accordingly, when "a noncitizen attempts to unlawfully cross the border," his "constitutional right to due process does not extend beyond the rights provided by statute." *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 676 (S.D. Tex. 2021).

Any process due to Petitioner, therefore, is limited to "the procedure authorized by Congress." *Mezei*, 345 U.S. at 212. *See also Augustin v. Sava*, 735 F.2d 32, 36 (2d Cir. 1984) ("Although aliens who petition for admission have no constitutional rights regarding their applications, they do have such statutory rights as Congress grants").

Section 1225(b)(2)(A), with limited exceptions irrelevant here, mandates detention of aliens in removal proceedings: "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien *shall be detained* for a proceeding under section 1229a of this title" (citation modified). *See*

*also* 8 C.F.R. § 235.3(b)(1)(ii) (same).[13] In fact, immigration judges are prohibited by regulation from holding bond hearings for arriving aliens. *See* 8 C.F.R. § 1003.19(h)(2)(i)(B) ("[A]n immigration judge may not redetermine conditions of custody imposed by the Service with respect to . . . [a]rriving aliens in removal proceedings, including aliens paroled after arrival pursuant to section 212(d)(5) of the Act.").

Indeed, the Supreme Court has confirmed that, read "most naturally," Section 1225(b)(2) "mandate[s] detention of applicants for admission until certain proceedings have concluded." *Jennings*, 583 U.S. at 297. And once "those proceedings end, detention under [Section] 1225(b) must end as well." *Id.* Until "that point, however, nothing in the statutory text imposes any limit on the length of detention." *Id.* And Section 1225(b)(2) does not say "anything whatsoever about bond hearings." *Id.* *See also Nieto v. Ceja*, No. 1:24-CV-02821-DDD-NRN, 2025 WL 4087626, at *7 (D. Colo. June 12, 2025) ("[P]rocedural due process does not afford inadmissible arriving aliens subject to prolonged detention a right to release or a bond hearing prior to the conclusion of removal proceedings. . . . The statutory procedures authorized by Congress here dictate that [the petitioner] be detained unless she is admitted or paroled . . . and the parole statute commits the decision of whether to parole an inadmissible arriving alien to the discretion of the Secretary of Homeland Security") (citation modified).

---

[13] In addition, 8 U.S.C. § 1182(d)(5) authorizes the Secretary of Homeland Security, "in his discretion," to parole noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit."

Accordingly, Petitioner has received all the process he is due.[14] And because the relevant statute requires neither release nor a bond hearing, Petitioner's procedural due process claim fails for this reason too.

### C. Petitioner Also Fails Under *Mathews v. Eldridge*

Finally, to the extent a potential due process claim remains for further evaluation, this Court recognizes that, as a general proposition, deciding what process is due ordinarily requires interest balancing under the framework outlined in *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976).[15]

The *Mathews* factors favor Respondents. First, while Petitioner asserts an interest in freedom from imprisonment, the "private interest here is not liberty in the abstract, but liberty in the United States" by someone who has not been admitted to

---

[14] *Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020), and *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024) *cert. granted, Genalo v. Black*, 2026 WL 1718025 (U.S. Jun. 15, 2026) (No. 25-886), do not control here. Those cases address detention under Sections 1226(a) and (c). The Second Circuit has never held that aliens detained pursuant to Section 1225(b)—and are "seeking admission"—are entitled to bond hearings after any period of detention. And those decisions do not articulate a historical liberty interest of the sort that Petitioner claims here. Finally, to the extent these cases are somehow read to require a *Mathews* analysis here, that follows.

[15] *See, e.g., Black*, 103 F.4th at 150; *Velasco Lopez*, 978 F.3d at 842. In this Court's view, however, *Zadvydas* and *Demore* have already done whatever balancing is necessary. *See, e.g., Zadvydas*, 533 U.S. at 682, 701 (linking a "'reasonable time' limitation" to "the likelihood of removal in the reasonably foreseeable future"); *Demore*, 538 U.S. at 528 (explaining that, "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means," so it is sufficient if "detention necessarily serves the purpose of preventing deportable aliens from fleeing prior to or during their removal proceedings"). And the *Demore* majority opted for a bright-line rule: the government can detain an alien for as long as deportation proceedings are still "pending." 538 U.S. at 527. Nevertheless, an analysis of the *Mathews* factors does not alter the outcome.

the country but remains eligible to live at liberty in his native land. *See Parra*, 172 F.3d at 958. And any interest Petitioner may have in freedom from imprisonment is outweighed by the fact that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Demore*, 538 U.S. at 526. Moreover, because Petitioner's detention has a definite end point, any private interest will only be affected for a limited time.

Second, the risk of erroneous deprivation of liberty here is slight. There is no evidence to suggest that the ordinary process is deficient in mitigating the risk of or has led to an error. Nor does Petitioner claim he is not the person who ICE sought to detain.

Lastly, the Government has a substantial interest in ensuring that deportable aliens appear for immigration proceedings. Indeed, the "public interest is substantial given the high flight rate of those released on bail." *Parra*, 172 F.3d at 958. The Government also has a substantial interest in this and many like cases in preventing risk to the community by releasing potentially dangerous aliens from detention.

In sum, even if some Governmental deprivation—and some relevant and context-specific liberty rights—existed here, the amount of corresponding process that would be due to Petitioner on this release question under the three-factor, "flexible," and "situation[al]" approach outlined in *Mathews* remains the amount provided for by Congress.

## CONCLUSION

For the reasons stated above, Petitioner is detained under 8 U.S.C. § 1225(b)(2)(A) and is not otherwise entitled to a bond hearing. Respondents' motion to dismiss, Dkt. 11, is granted, and the petition is denied.

The Clerk of Court shall close this case.

SO ORDERED.

Dated: July 23, 2026
Buffalo, New York

JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE